LEAR, Judge,
dissenting.
Joanne James, plaintiff-appellant, instituted this suit on behalf of her four and one-half year old minor son, Robert Lee James, who was seriously injured in an automobile-pedestrian accident. The matter was tried before a jury which returned a verdict finding the defendant-driver, Kenneth L. Dupont, free of negligence and *393 rendered a judgment against the plaintiff who now perfects this appeal. The majority today affirms the judgment below holding that it is unable to find manifest error in the refusal of the trial court to give plaintiff’s Special Charge Number 1 and that, in any event, the record supports the finding of the jury. I dissent.
The context facts are that Joanne James, appellant, left her three children, Robert Lee James, age 4 years and 7 months, Theresa James, age 6 years, and Melissa, age 1 year, with a neighbor, Jessie Lee Beckham. Jessie Lee Beckham, like Joanne Jones, lived down a lane off of Champ Cooper Road or Louisiana Highway 445 in Tangipahoa Parish. Ms. Beckham, who had minor children of her own, agreed to watch the James children while their mother went shopping. Shortly thereafter, Bridgette Beckham, age 10, her sisters, Carrie and Phyllis, age 7 and 5, respectively, Robert Lee and his sister, Theresa, age 6, all left the home of Jessie Lee Beckham to go to a grocery store across Champ Cooper Road. The Beckham house, according to the trial testimony, is located some one hundred yards east of Champ Cooper Road. The grocery store, owned by York Bailey, fronted Champ Cooper Road on the west side of the highway.
According to the testimony of Bridgette Beckham who was the oldest in the group (10), these children walked through the yard of Ben McGary, whose house fronted Champ Cooper Road, to an area very near the highway where mailboxes were located. While these children were standing on the side of the road and waiting for the Dupont vehicle to pass, Robert Lee ran, suddenly, out into the roadway and was struck by the Dupont vehicle. Robert Lee was the only child to enter the roadway.[1]
*394 Defendant Dupont was age 31 at the time of the accident and had resided in Tangipa-hoa Parish all of his life. He testified that he was familiar with that area of the parish because he had lived near there. He also testified that he had been previously employed as a school bus driver and had transported children to a school within one mile of the accident.[2]
His trial testimony was to the effect that he was proceeding from south to north along Champ Cooper Road. His vehicle was in the west lane or that lane nearest to where the children were standing. Dupont testified that there is a curve in the road south of the point where the children were standing and that as he cleared the curve he saw both a tractor-trailer approaching him from the north and children[3] walking on the shoulder of the road. When questioned about his speed, Dupont stated that he was driving at a speed of 55 miles per hour but slowed his vehicle after he observed the tractor-trailer approaching and the children on the shoulder of the highway. His testimony that he reduced his speed conflicted with the entry made by the investigating state trooper who stated that defendant admitted he was going 55 miles per hour when the accident occurred. Nor is there any dispute with defendant’s assertion that he was closer to the curve than to the children when he first saw them.
Shortly after the accident, pictures were taken of the scene by both plaintiff and defendant. (See D-l, D-5, P-6, 7, 8 and 9.) These photographs show that section of the road where the accident occurred, the skid-marks left by defendant’s vehicle, a 1976 Grand Prix Pontiac, and the rut markings where the car came to rest in a ditch.
Plaintiff called and qualified Dr. Olin K. Dart, Jr., a professor of civil engineering at Louisiana State University. Dr. Dart testified that he had conducted tests at the site of the accident and had examined certain pictures filed in evidence which were taken shortly after the accident by both the plaintiff and defendant. He stated that his examination and measurements along Champ Cooper Road revealed that the curve referred to by defendant is some 760 feet away from the “mailboxes” near which the children were standing; that in addition to the straightaway distance of 760 feet, that portion of the curve just prior to the straightaway-some 390 feet of it-also provides an unobstructed view. Dart testified that a motorist-as here-traveling south to north could and should see the mailbox, roadway and shoulder of the road in front of Ben McGary’s house. This total distance was measured to be 1150 feet.
The testimony most damaging to defendant’s position that the accident was unavoidable and that he was driving at a safe and prudent speed is that relating to the skidmarks. Dr. Dart’s analysis of the skid-marks shown in the picture exhibits was as follows:
“Q. Doctor Dart can you then determine from the measurements you made, and the diagram, the amount of skidmarks laid down on the roadway by the Dupont vehicle?
*395 A. Yes sir. The left front wheel . the length of this skidmark is approximately 115 feet, and this rear track appears to be closer to 140 feet. If you like I will scale them off of here and get more precise.
Q. Please do that.”
***** *
“Q. The longest skidmark you see would be the left front?
A. The left rear is the longest one I see on the pavement. Its about 180 feet.
Q. Doctor can you tell us the distance the vehicle came to rest from the spot where the vehicle came to rest and where you saw the first sign of skidmarks in the photographs?
A. Very close to 200 feet.”
******
“Q. Doctor based on your observation of the skidmarks in these photographs, and assume that the skidmarks are accurately shown on the photographs and assume the vehicle came to rest at the point in the ditch as shown by the photographs which indicates . . . • shows ruts in the ditch, can you, from that, and the observations and measurements that you made, compute the minimum speed of this vehicle at the time the brakes were applied? ******
“Q. Doctor what is your estimate of the speed of the vehicle based on those skidmarks?
A. 61 miles an hour.
Q. What were the skidmarks that you measured again now for the other wheels . . . you were talking about the left front then . what about the skidmarks for the others?
A. Well the left rear went about 180 feet out on the pavement, and the remaining 20 feet, approximately, on the shoulders, so the estimate of speed from that wheel would have been higher.
Q. How much higher?
A. I did not figure that, but I can. That would be 64 miles an hour.
(See record, Pp. 204-280.) ******
Against the backdrop of the testimony outlined above, plaintiff requested that the jury be given Special Charge Number l.[4] The trial court refused and plaintiff assigned error.
In all jury cases, the trial court must charge the jury on the principles of law which apply to the facts of each particular case. Consistent with the evidence herein, the plaintiff and defendant are equally entitled to request that special charges be given as that cited in footnote 4. I am of the opinion that the plaintiff was legally entitled to have the jury instructed on this critically important legal principle. Arcen- *396 eaux v. Domingue, 365 So.2d 1330, 1334 (La. 1978).
In Gomales v. Xerox Corporation, 320 So.2d 163, La.App. 1st Cir. (1975), the father and mother brought an action for the death of a 4V2 year old girl who was struck by a vehicle while crossing the highway. Our court in discussing the facts of that case observed that the failure of the trial court to instruct the jury on essentially the same elements forming the basis of Special Charge Number 1, herein, was reversible error. Plaintiff’s theory of the case at bar is that defendant Dupont was travelling on a clear day, along an unobstructed highway, at a high rate of speed and that he observed conditions of peril: (1) the tractor — trailer and (2) the presence of children on the shoulder of the highway. Given these facts-in which direction the evidence preponderates-plaintiff was clearly entitled to the requested instructions. See Pea v. Smith, 224 So.2d 37, La.App. 1st Cir. (1969).
The theory of the defense was that the defendant-driver never, in fact, saw the 4V2 year old Robert Lee; that his (Robert Lee’s) presence was concealed by other children (“people”) or by a large oak tree located some 29 feet from the highway; that suddenly, without warning, the child darted across the path of his vehicle which he had slowed to a speed of “35 miles per hour”, to avert the hazards of the road. In my opinion, the defendant does not exonerate himself from fault by any showing. He is caught up in a web of our holdings recently spun: Gonzales, supra, (1975); Ford v. Knight, 337 So.2d 1225, La.App. 1st Cir. (1976); Sanders v. English, 325 So.2d 692, La.App. 1st Cir. (1976); LaCroix v. Middle South Services, Inc. 345 So.2d 136, La.App. 1st Cir. (1977); and Baumgartner v. State Farm Mutual Automobile Insurance Co., 356 So.2d 400, La.App. 1st Cir. (1978).
The majority hinges its decision primarily on the testimony of Liska Laurent, an elderly lady who was visiting in the home of Ben McGary and who apparently observed a segment of the event described hereinabove and whose testimony — quoted in the majority opinion-nevertheless merely corroborates that of other witnesses that the child ran or “darted” across the highway. This cannot and does not excuse the negligent acts of defendant. The “obstacle” of other children, aged 4, 6, 7 and 10 years, is not the obstacle or “concealed position” contemplated in our decision in Duraso v. Barbo, 215 So.2d 908, La.App. 1st Cir. (1968). Moreover, defendant’s background as a school bus driver imputes to him a greater awareness of the rash and sudden acts of children and should clearly have caused him to reduce his speed to at least a minimum speed consistent with that of school zones.
Finally, as noted in footnote 1 of the majority opinion, the trial court gave an instruction on the presumption of regularity. Plaintiff objected thereto and assigned error. While I am disposed to reverse and to decide the other issues in this matter, see Arceneaux v. Domingue, cited supra, I want only to suggest that such an instruction was dubious at best.
For the reasons assigned, I dissent.

. Testimony of Bridgette Beckham at Pp. 186-188:
Q. How were you standing, do you remember where were the other children with relation to you? Now, by that I mean Bridgette, who was on which side of you, if any?
A. Head was at the end.
Q. Head was at the end, and where were the others?
A. And then Theresa was by Head, and then Phyllis was third by Theresa, and then I was fourth by Phyllis.
Q. And were was Carrie?
A. Carrie Mae was by me.
Q. By you?
A. Yeah wait a minute. Phyllis was by Carrie Mae, and then Carrie Mae was by me.
Q. So then it was Robert Lee and Theresa
Yeah.
. Phyllis and Carrie, and you?
Yeah.
Now, do you remember the car that hit Robert Lee?
I just know it was white . . . that’s the only color I <
That car, Bridgette, what direction did it come from? c?
This direction.
That direction. The direction that the car came from, and you said you all were lined up with Robert Lee, Theresa, Phyllis, Carrie Mae and You .
Yes.
. in the direction that the car was coming from who was closer to that direction? Closer to the car, you or Robert Lee?
Robert. <
Were you holding hands there on the side of the road? Were you holding hands, you and Phyllis, and Carrie, and Theresa, and Robert? O'
I don’t know. >
Do you know if you were holding Robert Lee’s hand? <o
I couldn’t. >
You couldn’t. All right. Now, did you see the car that hit Robert Lee before it hit him? o
Yeah. >
What did Robert Lee do? ... at the time he got hurt? a
He ran across the street. >
He ran across the street. Did he run by himself? o
Uh huh.
None of the others ran with him?
No.
Did you yell at him or anything when he ran?
I don’t know.
You don’t know. Did you see the car hit Robert Lee?
Yeah. >
When you first saw that car, before it saw o
Robert Lee, do you know where it was?
Where it was? >
Yeah, before it hit Robert Lee . <o
did you see it coming Bridgette?
Yeah, from around a curve. >
You saw it coming from around the curve? It came around the curve and came on by you? o
Yeah.

. BY MR. TRICHE:
Q. Mr. Dupont you are Kenneth Dupont, and you are the defendant driver in this case?
A. Yes.
Q. You live several miles down from the Champ Cooper Road, the place where this accident happened?
A. Yes.
Q. You, at one time, were a school bus driver?
A. Yes.
Q. And drove a school bus to the little school that is located along the Champ Cooper Road some ways up the road from where the accident happened?
A. Yes, I did.
Q. How far is that school from where the accident happened?
A. About a mile.
Q. When you were driving the school bus along this same route, past the scene where the accident occurred, to that school, just about every day that school was in session?

. Although defendant Dupont admitted in his pretrial deposition that he saw the children along the shoulder of the roadway well in advance of the accident, he sought at trial to make them “adult people”. (See deposition of Kenneth Dupont at Pp. 4-8 and record at Pp. 155-161.)

. SPECIAL CHARGE NUMBER 1.
It is the duty of one operating a motor vehicle to keep a sharp lookout ahead to discover the presence of pedestrians who might be in danger. What the motorist can see, he must see and in legal contemplation he does see. His failure to see what he could have seen by the exercise of due diligence does not relieve him from liability.
A motorist, as operator of a dangerous instrumentality, such as a motor vehicle, creates a great risk of injury to life and limb of pedestrians and therefore, owes a duty to the public to protect it from danger. Motorists are aware that they could meet many emergencies in which pedestrians will not always act wisely or prudently and will sometimes be found in perilous situations; therefore, motorists have the additional burden of keeping roads safe even for those who are negligent.
The law imposes on a motorist the additional burden of keeping the roadways safe when he saw or should have seen impending or threatening danger and had, at the moment, the opportunity to avoid it.
Negligence of a pedestrian, in placing himself in the path of oncoming traffic, is no defense to the charge of negligence of the motorist.
The law imposes these burdens upon motorists in favor of pedestrians because the operation of motor vehicles creates a great risk of injury to life and limb of pedestrians, and small risk of harm to motorists from pedestrians.